UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

JOHN DOE, MARY DOE,　　　　　)
AND JAMES DOE,　　　　　　　　)
　　　　　　　　　　　　　　　　)　　Judge Mattice
　　　　*Plaintiffs*　　　　　　　)
　　　　　　　　　　　　　　　　)　　Case No. 4:09-cv-62
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
THE UNIVERSITY OF THE SOUTH,　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)

## MEMORANDUM AND ORDER

The following are presently before the Court: (1) Defendant University of the South's

(the "University") Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction and

Failure to State a Claim [Court Doc. 10]; (2) the parties' response to the Court's Show

Cause Order of September 1, 2009 [Court Doc. 30]; and (3) Defendant's Objection to

Magistrate Judge Lee's Memorandum and Order of August 7, 2009 granting Plaintiffs'

Motion to Proceed Under Pseudonyms and for Protective Order.  [Court Doc. 25.]

Defendant seeks to dismiss Plaintiffs' claims which are based upon Title IX of the

Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX") and the Jeanne Clery

Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. §

1092(f) (the "Clery Act."); (Court Doc. 1, Pls.' Compl. Count III and Count IV).  In addition,

on September 1, 2009,  the Court entered a Show Cause Order, which required the parties

to brief the "question of whether Plaintiffs have alleged sufficient facts that would establish

that Defendant had explicitly or implicitly entered into a contractual or quasi-contractual

relationship with James Doe and Mary Doe" and have standing to pursue such claims

against the University.  [Court Doc. 30, Show Cause Order at 1.]  Finally, the University

objected to Magistrate Judge Susan Lee's Memorandum and Order granting Plaintiffs' Motion to Proceed Under Pseudonyms and for Protective Order on the grounds that Judge Lee incorrectly applied the legal standard governing this issue. (Court Doc. 25, Def.'s Object. to R&R at 1).

For the reasons explained below, Defendant's Motion for Partial Summary Judgment will be **GRANTED** and Counts III and IV of the Complaint will be **DISMISSED WITH PREJUDICE.** Plaintiffs James Doe and Mary Doe's Contractual and Quasi-Contractual Claims against the University [Counts I, II, XII] are will also be **DISMISSED WITH PREJUDICE.** The University's Objection to United States Magistrate Judge Susan K. Lee's Memorandum and Order granting Plaintiffs' Motion to Proceed Under Pseudonyms and for Protective Order [Court Doc. 25] will be **OVERRULED.**

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a complaint over which the Court lacks subject matter jurisdiction. "Where subject matter jurisdiction is challenged pursuant to 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Michigan S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Assn.*, 287 F.3d 568, 573 (6th Cir. 2002). Challenges to subject matter jurisdiction may be either facial or factual. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). A facial challenge is a challenge to the sufficiency of the pleading. *Ritchie*, 15 F.3d at 598; *Ohio Nat'l*, 922 F.2d at 325. When reviewing a facial challenge, the Court must accept as true all well-pleaded factual allegations in the complaint and construe the complaint in the light

most favorable to the nonmoving party. *Ritchie*, 15 F.3d at 598; *Ohio Nat'l*, 922 F.2d at 325. In contrast, a factual challenge is "not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *Ritchie*, 15 F.3d at 598. When reviewing a factual challenge, no presumption of truthfulness applies to the factual allegations of the complaint, and the Court must weigh the conflicting evidence to determine whether subject matter jurisdiction exists. *Id.*; *Ohio Nat'l*, 922 F.2d at 325. The Court has "wide discretion to allow affidavits, documents and even a limited evidentiary hearing" to resolve disputed jurisdictional facts. *Ohio Nat'l*, 922 F.2d at 325.

The purpose of Rule 12(b)(6) is to permit a defendant to test whether, as a matter of law, the plaintiff is entitled to relief even if everything alleged in the complaint is true. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). To survive a motion to dismiss under 12(b)(6), plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Assoc. of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (citing *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1974 (2007)). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*.

The Court must determine not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support his claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In making this determination, the Court must construe the complaint in the light most favorable to plaintiff and accept as true all well-pleaded factual allegations.

-3-

*Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). The Court need not accept as true mere legal conclusions or unwarranted factual inferences. *Id.*

Recently, the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a)**,** which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly,* 127 S. Ct. at 1974; Fed. R. Civ. P. 8(a)(2). A court must not dismiss a complaint for failure to state a claim unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S. Ct. at 1974; see also *Erickson v. Pardus,* 127 S. Ct. 2197, 2200 (2007). Although material allegations in the complaint must be accepted as true and construed in the light most favorable to the nonmoving party, a court is not required to accept conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. *Id.*

"Two working principles underlie [the Supreme Court's"] decision in *Twombly."* *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949-1951 ( 2009). "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (internal citations and quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (internal citations omitted). While "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.*

"Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,*129 S. Ct. at 1949-1951. "Determining whether a complaint states a

plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (internal citations and quotations omitted). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – that the pleader is entitled to relief." *Id.* (internal citations and quotations omitted).

## II.     FACTS

Following an incident on August 30, 2008, a female university student (Complainant) accused Plaintiff John Doe of sexually assaulting her. (Court Doc. 1, Compl. ¶¶ 31-32, 53, 62.)  On September 19, 2008, following a disciplinary hearing, the University found that Plaintiff John Doe, an undergraduate at the University, had sexually assaulted the Complainant in the early morning of August 30, 2008 and, thereby, had violated the University's Sexual Assault Policy and Procedures.  (*Id.* ¶¶ 10, 31-62.)  The University presented Plaintiff with two options for punishment: (1) a one semester suspension with the sexual assault on his student record; or (2) withdrawal from the University for two semesters.  (*Id.* ¶¶ 53, 62).  The University imposed additional conditions for John Doe's return under either option, including re-application to, and approval by, the University Admission's Committee.  (*Id.*)  Plaintiff John Doe withdrew from the University with the possibility of returning in the fall of 2009.  (*Id.* ¶ 63.)  Plaintiff John Doe ultimately decided to not seek re-admission to the University.  (*Id.*)

On June 30, 2009, Plaintiffs filed the instant action against the University. The Complaint contains twelve counts, alleging that the University committed a number of statutory, contractual, and tort violations in connection with the University's investigation

-5-

of the charges made against Plaintiff John Doe as well as the University's disciplining of Plaintiff John Doe.

## A. Overview of the University's Procedures Concerning Sexual Assault Allegations

The University's Sexual Assault Policies and Procedures provide the following mechanisms for the University's investigation and adjudication of sexual assault claims. Under this policy, any student who wishes to file a sexual assault complaint against another student may: (1) report the incident with a request that "no action" be taken; (b) report the incident with a request that an "information action" be taken; (c) report the incident and request that the respondent agree to have no contact with the complainant for a specified period of time; or (d) report the incident and "file a formal charge of sexual assault" with one of the deans of students.  (Compl. ¶ 29.)

When a complainant files a formal charge of sexual assault against another student, the University's Sexual Assault Policies and Procedures mandate the following:

(1) The Dean of Students will inform the respondent of the charges pending against him or her typically within five class days of learning that a formal charge is being pursued:

(2)The complainant and respondent are each entitled to select a designated "Consultant" who will serve as his or her "Hearing Advisor," who is familiar with the formal processes for hearing cases of sexual assault and is knowledgeable about: (I) the seriousness of the charge(s), procedure, and possible penalties if found responsible; (ii) the University's conduct standard for sexual assault; (iii) the University's resources available to the respondent; and (iv) the option of informing parents and guardians of the matter:

(3) The Dean of Students is tasked with appointing an investigator within three days of receiving a formal charge of sexual assault.

(4) The investigator interviews each of the students involved in the alleged incident as well as any possible witnesses, and, if possible, obtains a written statement from each witness.  The investigation portion of the process

-6-

typically takes five to ten class days.

(5) The complainant and the respondent are each permitted to submit a written statement that sets forth facts in support of their respective positions. Each is to have the opportunity to work with his or her Consultant/Hearing Advisor in the preparation of his or her statement, and, if desired, to consult with his or her patents and/or an attorney. During the period before the hearing, the complainant and the respondent are each permitted to invite a member of the college community (faculty, staff, or student) to speak to [his or her] character during the official hearing. The witness will only be present at the hearing during his or her statement.

(6) The respondent will be notified of the actual date and time of the hearing at least 24 hours prior to the hearing.

(7) The hearing is presided over by the Faculty Discipline Committee (the "Committee"), which is composed of the Dean of Students and four faculty members. The Dean of Students is the Chair of the Committee. Three members of the Committee constitute a quorum and must be present at all stages of a hearing.

(8) The complainant and the respondent may be accompanied to the hearing by his or her respective Consultant/Hearing Advisor. During the hearing, the Consultant/Hearing Advisor may confer with his advisee, but may not address the Committee. A respondent's parents or attorney may not attend the hearing. "[A]t the beginning of the hearing," the complainant and the respondent will each "have an opportunity to see the other reports [i.e., witness statements]." The complainant and the respondent are not permitted to be in the hearing room at the same time. The Dean of Students fulfills the role of prosecutor at the hearing. The hearing is not recorded "unless special permission is requested and granted by the chair," i.e., the Dean of Students.

(9) "[P]rior to the hearing," the investigator reports the results of his investigation to the Committee, including the written statements of witnesses, if any. The Committee then reviews the written statements of the complainant and the respondent. The character witnesses give oral testimony, as do the complainant and the respondent. "Any witnesses that have information pertaining to the incident will be given a chance to [testify]." The Committee is free to question any witness and to recall any witness for additional questioning.

(10) After the evidentiary phase concludes, the Committee, including the Dean of Students, holds a "closed meeting" and determines whether the respondent is guilty of the charges. The evidentiary standard is "a preponderance of the evidence," which the University defines as a "51 %

-7-

certainty that the respondent is responsible for a violation of the sexual assault policy." If the decision is adverse to the respondent, the Committee members (but not the Dean of Students) recommend a proposed punishment to the Dean of Students, "who has authority to accept, modify, or reject the recommendation of the [C]ommittee." The Dean of Students thus acts as the prosecutor, fact finder, and sentencing judge. Finally, the Dean of Students notifies the respondent of the Committee's decision and the punishment to be imposed, if any.

(11) The Sexual Assault Policies and Procedures do not prescribe an appellate process. A respondent found guilty of sexual assault has the right to appeal the decision and punishment imposed under the appeals process set forth in the general student disciplinary system procedures. That appeal lies with the Vice Chancellor of the University, who is the chief executive officer and "the official ultimately responsible for the order and discipline of the University."

Compl. ¶¶ 26-30.

## B.    Plaintiff John Doe's Hearing

In this instance, the Complainant filed a formal charge accusing Plaintiff John Doe of sexual assault pursuant to University's Sexual Assault Policies and Procedures. (Compl. ¶ 31.) After the formal charge was filed, various administrators for the University met and investigated the Complainant's allegations. (*Id.* ¶¶ 33, 34.) At 11:00 p.m. on September 17, 2008, Plaintiff John Doe was informed that Eric E. Hartman, Dean of Students, wanted to see him first thing in the morning. (*Id.* ¶ 35.) On the morning of September 18, 2008, Dean Hartman met with Plaintiff John Doe. (*Id.*) Dean Hartman informed Plaintiff John Doe that he was accused of sexual assault, the basis of the charge, the names of individuals who provided statements, witnesses, and that the disciplinary hearing was scheduled for September 19, 2008. (*Id.* ¶ 37.)

Plaintiffs also allege that Dean Hartman informed John Doe of the following: (1) an

investigator had gathered all the relevant information; (2) Hartman and the Committee would provide all the witnesses; (3) the only witness Doe could bring was a character witness who could testify as to Doe's morals and his standing in the community; and (4) Doe needed to provide a written statement of his defense as soon as possible. (*Id.* ¶ 38) Although Dean Hartman recommended that John Doe use David L. Spaulding, Ph.D., the Director of the University Counseling Service as his representative at this hearing, he discouraged Doe from bringing any other supporters to this hearing. (*Id.* ¶¶ 38, 41.) Plaintiff did not inform his parents about the hearing nor did he consult an attorney, but did submit a written statement to Dean Hartman on the morning of September 19, 2008. (*Id.*)

On September 19, 2008, Doe arrived at the disciplinary hearing with his character witness, an "assistant proctor" (a resident advisor) from his dormitory. (Compl. ¶ 42.) The hearing investigator asked John Doe to provide more specifics about some of the times in his written statement. (*Id.* ¶ 42.) Dean Hartman provided Doe a copy of the Complainant's written statement before he attended the hearing. (*Id.*) John Doe and Dr. Spaulding were not permitted to attend any portion of the hearing other than when Doe was testifying and being questioned by panel. No recording or transcript was made of the hearing. (*Id.* ¶ 43.) Plaintiffs allege, upon information and belief, that the hearing panel heard oral testimony from the hearing investigator, the Complainant, John Doe, and the respective character witnesses for the Complainant and John Doe. (*Id.* ¶ 45.) Plaintiffs also allege, upon information and belief, the panel reviewed a police report of the alleged sexual assault as well as the hospital records of the Complainant's examination on August 30, 2008. (*Id.*)

-9-

The hearing panel consisted of Dean Hartman and three other members of the Faculty Discipline Committee. (Compl. ¶ 44.) Plaintiffs allege, on information and belief, that none of these individuals were trained in "adjudication; in the law; in weighing evidence; in what type of conduct constitutes sexual harassment or sexual assault; or in the relevance or irrelevance of evidence in the alleged sexual assault setting." (*Id.*) "In addition to chairing the Committee, Dean Hartman also served as the prosecutor during this hearing." (*Id.* ¶ 44.)

The hearing, which lasted between five and six hours, ended with Dean Hartman's statement that: (1) he and the rest of the hearing panel members would deliberate and decide whether the charges had been proven; and (2) if the charges were proven, the three faculty members of the hearing panel would recommend a punishment to Dean Hartman, who was free to accept, reject, or modify their recommendations. (Compl. at. ¶ 51.)

One hour after the conclusion of the hearing, Dean Hartman informed John Doe that he and the other panel members had deliberated and that a majority had concluded that he had committed Category 1 sexual assault. (Compl. ¶ 52.) Dean Hartman informed John Doe of two punishment options: (1) suspension for the current semester, but he would be allowed to re-enroll in the University in January 2009 with the sexual assault finding as part of his record; or (2) "withdrawal" from the University, with the option to return in the Fall of 2009. Under either option, the University imposed additional conditions for John Doe's return, including re-application to, and approval, by the Admissions Committee. (*Id.* ¶ 53.)

John Doe was informed that he had a right to appeal this decision to the Vice Chancellor, but was cautioned that the Vice Chancellor could increase the punishment to

a multiple-year suspension or an expulsion. (Compl. ¶ 54.) Plaintiffs also allege that Dean Hartman informed Plaintiff that the Complainant might pursue criminal charges against him if he were to appeal this decision. (*Id.*) Dean Hartman then informed John Doe that he had a few days to choose the punishment but that he was required to leave campus by Sunday September 21, 2008. Plaintiffs also allege that John Doe was instructed to destroy all written materials he had related to the charge and hearing. (*Id.*¶ 55.) Acting in accordance with the instructions, John Doe destroyed all such written materials and left campus on September 21, 2008. (*Id.* ¶ 56.)

John Doe appealed the Committee's decision by letter dated September 26, 2009. (Compl. ¶ 59.) He contended that: (1) he did not have sufficient notice of the hearing; and (2) it was evident that the charge was not properly investigated given that the investigator first interviewed him shortly before the start of the hearing. (*Id.*) On October 3, 2008, the University's Vice Chancellor denied this appeal by letter and affirmed Dean Hartman's findings and actions. (*Id.*¶¶ 60-62.) John Doe withdrew from the University with a possibility of returning in the Fall of 2009, but he ultimately decided not to seek re-admission to the University. (*Id.* ¶ 63.)

## III.  ANALYSIS

### A.  What Is and What Is Not Before the Court

This case comes before this Court in limited posture. The Plaintiffs' claims against the University are grounded primarily upon the manner in which the University officials conducted the process leading to its conclusion that the Plaintiffs had violated the University's Code of Conduct and its imposition of sanctions. Plaintiffs claim that the

University's actions violated Title IX as well as the Clery Act and also assert various contract and tort claims against the University. *See* 20 U.S.C §§ 1681-1688; 20 U.S.C. § 1092; Compl. ¶¶ 66-175. Accordingly, "[t]his Court's review is substantially circumscribed; the law does not allow this Court to retry the University's disciplinary proceeding." *Gomes v. Univ. of Maine Sys.*, 265 F. Supp. 2d 6, 14 (D. Maine 2005).

This is not a lawsuit between the Complainant and the Plaintiffs. This Court is not asked to make an independent determination as to what happened between the Plaintiff John Doe and the Complainant on August 30, 2008. The Court therefore expresses no opinion as to whether a sexual assault occurred, whether any such acts were consensual, or who, as between John Doe and the Complainant is credible. In short, the instant lawsuit does not call for a judicial determination either in favor or against John Doe's claims or in favor or against the Complainant, regarding the merits of her claims.

### B.     Plaintiffs' Title IX Claims Against the University

Counts III and IV of Plaintiffs' Complaint allege that "the University's student disciplinary process, including the Sexual Assault Policies and Procedures, is, as implemented, contrary to Title IX" and that the University's actions in adjudicating the Complainant's claims against John Doe resulted in substantial damage and loss, including but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational and athletic opportunities; and loss of future career prospects. (Compl. ¶¶ 135-138.)

The University contends that Plaintiffs have failed to state a claim under Title IX and thus are not entitled to any relief under this statute. Plaintiffs contend that the University's

actions violated the regulations issued by the United States Department of Education, which require each school receiving Title IX funds to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student ... complaints alleging any action which would be prohibited by Title IX or its regulations. (Court Doc. No 18, Pls.' Resp. Br at 11.) Plaintiffs also contend such regulations require that "a school's procedures must 'accord[] due process to both parties involved ...'" (*Id.*) Plaintiffs claim the Title IX claim to recover damages and declaratory relief will contribute to the overall public policy goals sought to be advanced by Title IX. (*Id.*)

Title IX states in pertinent part, "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681(a). "Title IX claims against universities arising from disciplinary hearings" are analyzed under the "erroneous outcome" standard, "selective enforcement" standard, "deliberate indifference" standard, and "archaic assumptions" standard. *Mallory v. Ohio Univ.*, No. 01-4111, 76 Fed. App'x 634, 638 (6th Cir. Sept. 11, 2003) (internal citations omitted).

Under the "erroneous outcome" or "selective enforcement" standards, a plaintiff must demonstrate that the conduct of the university in question was motivated by a sexual bias. *Id.* Under the "deliberate indifference" standard, a plaintiff must "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Id.* Finally, under the "archaic assumptions" standard, a plaintiff seeking equal opportunities has "the burden in

establishing that a university's discriminatory actions resulted "from classifications based upon archaic assumptions." *Id.*

### 1. Plaintiffs Have Failed to Plead Facts Sufficient to Support a Finding Under the "Erroneous Outcome" Standard

Plaintiffs have not pled sufficient facts to support a finding under the "erroneous outcome" standard, namely that the outcome of the University's disciplinary proceeding was erroneous because of a sexual bias. Plaintiffs do contend that "the University's actions in the investigation and adjudication of the allegations against [John] Doe were wrong, willful, intentional, reckless, in clear violation of Title IX's requirements, and constituted an effort to achieve a predetermined result: a finding that Doe had committed a Category 1 sexual assault." Compl. ¶ 137.

This contention fails to allege, however, that the University's actions against John Doe were motivated by sexual bias or that the University's disciplinary hearing process constitutes a "pattern of decision-making" whereby the University's disciplinary procedures governing sexual assault claims is "discriminatorily applied or motivated by a chauvinistic view of the sexes." *Mallory*, 76 Fed. App'x at 640 citing *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994) (noting "one case by an individual who was subjectively dissatisfied with a result does not constitute a 'pattern of decision making,' referred to in *Yusuf* as a basis for finding bias."). Thus, the Court finds that Plaintiffs have failed to plead sufficient facts to support a finding under the "erroneous outcome" standard for Title IX claims.

### 2. Plaintiffs Have Failed to Plead Facts Sufficient to Support a Finding Under the "Selective Enforcement" Standard

Plaintiffs have also failed to plead sufficient facts to support a finding under the "Selective Enforcement" standard of Title IX. "To support a claim of selective enforcement, [Plaintiffs] must demonstrate that a female was in circumstances sufficiently similar to [John Doe's] and was treated more favorably by the University." *Mallory*, 76 Fed. App'x 641 citing *Curto v. Smith*, 248 F. Supp. 2d 132, 146-147 (N.D.N.Y. 2003) (dismissing a Title IX claim under a *Yusuf* analysis for failure to state a selective enforcement claim where academically-expelled female sought to compare more favorable treatment of males who have been dismissed due to misconduct.) Plaintiffs have failed to plead facts or provide the Court with any evidence that the University's actions against John Doe were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings. Thus, the Court finds that Plaintiffs have failed to plead facts to support a finding under the "selective enforcement" standard for Title IX claims.

### 3. Plaintiffs Have Failed to Plead Facts Sufficient to Support a Finding Under the "Deliberate Indifference" or "Archaic Assumptions" Standards

Plaintiffs have also failed to plead facts sufficient to support a finding under the "Deliberate Indifference" or "Archaic Assumptions" standards of Title IX. Plaintiffs' Complaint does not contain any allegation that the University's actions were based upon "archaic assumptions" regarding sex or gender. Thus, the Court finds that Plaintiffs' Title IX claim does not encompass the "archaic assumptions" standard.

Plaintiffs' Complaint could be arguably construed to encompass a "deliberate indifference" Title IX claim. Under the "deliberate indifference" standard, Plaintiffs have the

burden to "demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Mallory*, 76 Fed. App'x at 638. The "deliberate indifference" must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it. *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009). "[A] Plaintiff may demonstrate a defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* (internal citations omitted). Thus, under this standard,

> The recipient is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." The standard does not mean that recipients must expel every student accused of misconduct. Victims do not have a right to particular remedial demands. Furthermore, courts should not second guess the disciplinary decisions that school administrators make.

*Vance v. Spencer Cty. Pub. Sch. Dist.,* 231 F.3d 253, 260 (6th Cir. 2000) (internal citations omitted).

In the instant case, Plaintiffs allege that the University's Sexual Assault Policies and Procedures, as written and enforced, violate Title IX. Specifically, Plaintiffs contend that the University's "student disciplinary process, including the Sexual Assault Policies and Procedures, violate[] Title IX" because the procedures do not afford "prompt and equitable" due process. Compl. ¶¶ 128, 131. Plaintiffs cite a litany of authority which supports the proposition that a plaintiff who is subjected to sexual or gender harassment by a school,

college, or university is entitled to initiate a private right of action under Title IX.  *See* Pls.'
Resp. Br. at 10-13.

The facts pled by Plaintiffs, however, do not contain the critical component of any Title IX claim necessary to make a finding under the deliberate indifference standard, namely that the University's alleged actions constituted sexual harassment.  See Compl. ¶¶ 132, 137.  The Complaint fails to allege any facts to support a finding that the University's actions were at all motivated by John Doe's gender or sex or constituted gender harassment or sexual harassment.  *Doe v. Derby Board of Ed.*, 451 F. Supp. 2d 438, 445 (D. Conn. 2006) citing *Kelly v. Yale Univ.*, No. 3:01-cv-1591, 2003 U.S. Dist. LEXIS, at * 1, *4 (D. Conn. Mar. 26, 2003); *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1346-1350 (M.D. Ga. 2007) ("Whether gender-oriented conduct rises to the level of actionable harassment depends on a constellation of surrounding circumstances, expectations and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved. Notwithstanding the foregoing principles, a single instance of one-on-one peer harassment is likely not actionable under Title IX."). This is a necessary prerequisite for any Title IX claim.

Moreover, the Court finds that Plaintiffs' Title IX allegations must be dismissed because the "misconduct" at issue in the instant case, namely the  the University's alleged failure to comply with Title IX regulations promulgated by the United States Department of Education, does not confer a private right of action.[1]   Pls.' Br. at 3.  Although the U.S.

---

[1] The pertinent regulation of the United States Department of Education, promulgated pursuant to Title IX, states that each recipient of federal funds "shall adopt and publish grievance procedures providing for the prompt and equitable resolution of" complaints arising under Title IX and "shall designate at  least one employee to coordinate its efforts to comply with and carry out its responsibilities," including the investigation of any complaint.  34 C.F.R. 106.8.

Department of Education and other "[a]gencies generally have authority to promulgate and enforce requirements that effectuate the statute's non-discrimination mandate," the "implied right of action under Title IX" does not provide for the "recovery in damages for violation of those sorts of administrative requirements." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291-292 (1998). Therefore, the legal basis upon which Plaintiffs seek recovery, namely the University's alleged violation of the U.S. Department of Education's guidelines, do not provide for a private right of action under Title IX.

Thus, in addition to failing to plead facts to support a viable Title IX claim, Plaintiffs John Doe, James Doe, and Mary Doe do not have a right to pursue damages against the University. Finally, James Doe and Mary Doe "as parent[s] lack standing to assert a Title IX claim" because John Doe "has attained the age of majority." *Phillips v. Anderson County Bd. of Educ.*, 07*5103, 259 Fed. App'x 842, 843 (6th Cir. Jan. 15, 2008).

---

The United States Department of Education's Office of Civil Rights also published its "Revised Sexual harassment Guidance: Harassment of Students by School Employees, Other Students, Or Third Parties," which provides "principles that a school should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance." *See* 66 Fed. Reg. 5512 at I. The relevant portions of the U.S. Department of Education's Office of Civil Rights guidance provides:

> Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex.

*See* 66 Fed. Reg. 5512 at 14. The United States Department of Education's Office of Civil Rights guidance also requires schools to adopt sexual assault policies and procedures that:

> Ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions. Of course, schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.

*See* 66 Fed. Reg. 5512 at 22.

-18-

Accordingly, Plaintiffs' Title IX claims against the University will be **DISMISSED WITH PREJUDICE.**

## C.    Plaintiffs Request for a Declaratory Judgment Under the Clery Act

In Count III of the Complaint, Plaintiffs request that the Court invoke declaratory jurisdiction.  Specifically, Plaintiffs request that the Court enter a declaratory judgment that the University's Policies and Procedures governing Sexual Assault Allegations violates the Clery Act.  The Clery Act mandates, among other things, that all colleges and universities that accept federal funding adopt police and procedures for on-campus disciplinary action in cases of alleged sexual assault.  20 U.S.C. §1092(f)(8).  Specifically, the relevant portion of the statute provides:

> Procedures for on-campus disciplinary action in cases of alleged sexual assault, which shall include a clear statement that—
>
>     (I) the accuser and the accused are entitled to the same opportunities to have others present during a campus disciplinary proceeding; and
>
>     (II) both the accuser and the accused shall be informed of the outcome of any campus disciplinary proceeding brought alleging a sexual assault.

20 U.S.C. § 1092(f)(8(A)(ii).

The Declaratory Judgment Act provides that "[i]n  a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201 (emphasis added).  The Supreme Court has indicated that this act "confer[s] on federal

courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). In passing the act, Congress "created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Id.* at 288. District courts are afforded substantial discretion to exercise jurisdiction "in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and fitness of the case for resolution, are peculiarly within their grasp." *Id.* at 289.

In considering whether a district court has properly exercised its discretion in this regard, the United States Court of Appeals for the Sixth Circuit has traditionally focused on the five factors first articulated in *Grand Trunk W. R.R. Co. v. Consol. Rail Co.*:

(1) whether the declaratory action would settle the controversy;

(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata";

(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and

(5) whether there is an alternative remedy which is better or more effective.

746 F.2d 323, 326 (6th Cir. 1984) (formatting altered); *see also Travelers*, 495 F.3d at 271; *Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 812-13 (6th Cir. 2004); *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000).

The third and fourth of the above-cited factors have no particular relevance to this case. The Court, however, concludes that the first, second, and fifth factors strongly

-20-

counsel against this Court exercising its discretion to invoke its declaratory jurisdiction. With respect to the first prong of the Court's inquiry, acceptance of the declaratory action would not settle the underlying controversy between the parties. In addition to their Clery Act claim, Plaintiffs assert certain contract, quasi-contract, and tort claims against the University. Even if the Court were to conclude that the University's policies and procedures meet the two explicit requirements of the Clery Act, Plaintiffs contract, quasi-contract, and tort claims would remain unresolved.

On a related note, resolving the question of whether the University's policies and procedures violate the Clery Act would not serve a useful purpose in clarifying the issues before the Court. Plaintiffs' Complaint does not allege that the Complainant and John Doe were not informed of the outcome of any campus disciplinary proceeding brought alleging a sexual assault as required by the Clery Act. Plaintiffs, however, do contend that "the University's student disciplinary process, including the Sexual Assault and Polices and Procedures violated the Clery Act in that the timing of the notice of the hearing and the scheduling of the hearing deprived [John] Doe of the same opportunity as [the Complainant] to have witnesses present at the hearing." Compl. ¶ 133. Even if the Court were to resolve this issue, such a finding would have no bearing on Plaintiffs' pending contractual and quasi-contractual claims, and would be completely irrelevant to Plaintiffs tort claims. *See* 20 U.S.C. § 1092(f)(14)(A)(I)-(ii) ("Nothing in this subsection may be construed to--(I) create a cause of action against any institution of higher education or any employee of such an institution for any civil liability; or (ii) establish any standard of care.").

Finally, the U.S. Department of Education enacted, in accordance with the Clery

-21-

Act's mandates, specific regulatory guidance, rules, and potential fines that apply to every institution that participates in any federal student financial assistance program. 34 C.F.R. § 668.46. Resolving Plaintiffs' present issues within this regulatory framework is a better and more effective alternative remedy because a university's failure to comply with the mandates of the Clery Act may result in it not receiving federal funding for its student financial assistance programs. 34 C.F.R. § 668.1. Accordingly, the Court will not exercise declaratory jurisdiction and Plaintiffs' Clery Act claims will be **DISMISSED WITH PREJUDICE.**

### D. Plaintiffs James Doe and Mary Doe's Standing to Pursue Contractual and Quasi-Contractual Claims Against the University

Plaintiffs James Doe and Mary Doe assert several claims against Defendant that purportedly arise pursuant to a contractual or quasi-contractual relationship with the University. Compl. Counts I, II, XII. Plaintiffs contend that James Doe and Mary Doe entered into a contract implied in fact, a contract implied in law, and were third-party beneficiaries of John Doe's contract with the University of the South. Court Doc. 31, Pls.' Br. Show Cause at 2-5. Plaintiffs also contend that James Doe and Mary Doe are entitled to recover from the University under the doctrine of promissory estoppel and unjust enrichment. *Id.* at 5-6. The University contends that Plaintiffs have failed to present sufficient facts or law to establish that James Doe and Mary Doe have standing to pursue either contractual or quasi-contractual claims against the University. Court Doc. 32, Def.'s Resp. to Show Cause at 1-10.

For James Doe and Mary Doe to establish standing to sue the University under their breach of contract claims, they must first be able to prove the existence of a contract or for the Court to find that the parties must have entered into an agreement which is sufficiently definite and certain so that the terms are either determined or may be implied.[2]  Plaintiffs James Doe and Mary Doe contend that the payment of tuition created a contractual or quasi-contractual relationship with the University.  They have, however, failed to provide the Court with evidence or legal authority to support this proposition.

It is fairly evident that the "payment of tuition does not create a contractual relationship between parents and a college" when the parents' child is over the age of majority. *Apfffel v. Huddleston*, 50 F. Supp. 2d 1129, 1133 (D. Utah 1999).  When a child reaches the age of majority, such "standing simply transfers from the parent to the child." *Loch v. Bd. of Educ.*, No. 3:06-cv-17, 2007 U.S. Dist. LEXIS 67274, at * 5-6 (S.D.N.Y. Sept. 17, 2007) (limiting parents' standing in an Individuals with Disabilities Education Act claim).  Thus, the Court finds that Plaintiffs James Doe and Mary Doe have not pled sufficient facts, nor have they provided the Court legal authority, to support a claim for relief under a contract implied in fact theory.

---

[2] When jurisdiction is premised on diversity of citizenship, a plaintiff must have standing under both Article III and state law in order to maintain a cause of action.  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 173 (2d Cir. 2005) (and cases cited therein); *Metro. Exp. Servs. Inc. v. City of Kansas City, Mo.,* 23 F.3d 1367, 1369-70 (8th Cir. 1994) (and cases cited therein); *see also Myers v. Richland County,* 429 F.3d 740, 749 (8th Cir. 2005) (stating that a federal court cannot hear the plaintiff's state breach of contract claim unless he has standing to sue under state law); *Owens v. Ga., Inc. v. Shelby County,* 648 F.2d 1084, 1088-90 (6th Cir. 1981) (applying state law to determine whether unsuccessful bidder had standing to challenge a contract award to another bidder).

Plaintiffs James Doe and Mary Doe have also failed to provide legal or factual authority to support a finding that they are entitled to recovery damages against the University under a contract implied at law or under an unjust enrichment theory.[3] [4] The Court will analyze Plaintiffs James Doe and Mary Doe's unjust enrichment and contract implied in law claims together because they are essentially the same.[5] *Paschall's, Inc. v. Dozier*, 407 S.W. 2d 150, 154 (Tenn. 1966) (holding that "[a]ctions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and *quantum meruit* are essentially the same. Courts frequently employ the various terminology interchangeably

---

[3]The requirements for recovery under an unjust enrichment theory are as follows: 1) there must be no existing, enforceable contract between the parties covering the same subject matter, *Robinson v. Durabilt Mfg. Co.,* 195 Tenn. 452, 260 S.W.2d 174, 175 (1953); 2) the party seeking recovery must prove that it provided valuable goods and services, *Moyers v. Graham,* 83 Tenn. 57, 62 (1885); 3) the party to be charged must have received the goods and services, *Jaffe v. Bolton,* 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991); 4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.,* 595 S.W.2d 474, 482 (Tenn. 1980); and (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them. *Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 407 S.W.2d 150, 154 (Tenn. 1966).

[4] In the aftermath of the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007), the United States Court of Appeals for the Sixth Circuit has explained that a plaintiff's allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *Bredesen,* 500 F.3d 523, 527 (6th Cir. 2007). Moreover, the plaintiffs' "obligation to provide the 'grounds' of their entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action." *Id.* at 527. "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Id.*

[5]A party may recover damages in equity if there exists a contract implied in law, *see Paschall's*, 407 S.W.2d at 153; however, equitable relief is not available if there exists a contract implied in fact. *See Ridgelake,* 2005 WL 831594, at *8 (holding only contracts implied in law are creatures of equity); *see also, Daugherty v. Sony Elecs., Inc.,* 2006 Tenn. App. LEXIS 53, 2006 WL 197090 (Tenn.App. Jan. 26, 2006) ("One of the underlying requirements for stating an unjust enrichment claim is that there is no valid and enforceable contract between the parties"); *Metro. Gov't of Nashville v. Cigna Healthcare of Tenn.,* 195 S.W.3d 28, 2005 WL 3132354 (Tenn. App. 2005) ("Because a contract implied in fact exists, Metro is precluded from recovering damages under the equitable theory of unjust enrichment").

to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between parties, regardless of their assent thereto.").

In this instance, Plaintiffs James Doe and Mary Doe have failed to allege sufficient facts to "show mutual intent or assent to contract" or to show whether the "ordinary course of dealing and common understanding ... [would] show a mutual intention to contract." *Weatherly v. American Agric. Chem. Co.*, 16 Tenn. App. 613, 65 S.W.2d 592, 598 (Tenn. 1933). The University's refund provision, which is part of the University's publications Plaintiffs rely upon to establish reliance, contains no express or implied reference to repayment of fees to parents or third parties who provide for a student's tuition funding. *See* Defs.' Resp. Show Cause at 5. Thus, the Court finds that Plaintiffs James Doe and Mary Doe have failed to plead facts or cite law which establish they have standing to pursue a contract implied in law or unjust enrichment claim against the University.

Plaintiffs have also failed to plead facts to support their allegations of promissory estoppel. Promissory estoppel is described in Tennessee is as:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Amacher v. Brown-Forman Corp.,* 826 S.W.2d 480, 482 (Tenn. App. 1991) (quoting Restatement of Contracts 2d. § 90). "The limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial

loss to the promisee in acting in reliance must have been foreseeable by the promisor; and (3) the promisee must have acted reasonably in justifiable reliance on the promise as made." *Calabro v. Calabro,* 15 S.W.3d 873, 879 (Tenn. App. 1999).

While neither side disputes that Plaintiffs James Doe and Mary Doe provided their son money to pay for his education at the University, Plaintiffs have failed to cite any other legal or factual authority to support a finding that James Doe and Mary Doe reliance was justifiable. There is certainly no obligation that requires James Doe or Mary Doe to fund their adult son's college education or to provide financial support for their son. *Howard v. United States*, 2 F.2d 170, 176 (E.D. Ky. 1924) (stating a "parent is under no legal obligation to support an adult child," because "the legal liability for the support of the child ceases when it reaches the age of majority, unless the child is in such a feeble and dependent condition, physically or mentally, as to be unable to support itself.").

James Doe's and Mary Doe's affidavits, which attest that their "decision to pay [John Doe's] tuition and other expenses were made in reliance on the University's promises" set out in its "academic catalogues, publications, and the student handbook," fails to identify why the loss at issue, namely the payment of John Doe's tuition, would have been foreseeable to the University. *See* Court Doc. 31-1, Mary Doe's Aff., Court Doc. 31-2, James Doe Aff.

Were Plaintiffs James Doe's and Mary Doe's contentions in this regard to be adopted by the Court, any entity or individual funding a student's education would have standing to sue a college or university for a breach of an express or implied contract arising from representations made by a university in recruiting materials and publications.

-26-

Plaintiffs can cite to no authority to support such a proposition because it is clearly contrary to established law. *See Apfel*, 50 F. Supp. 2d at 1133 ("payment of tuition does not create a contractual relationship between parents and a college" when the parents' child is over the age of majority); *Runge v. Sanford*, No. 6:08-231, 2009 U.S. Dist. LEXIS 74506, * 5-6 (D. S.C. Feb. 25, 2009) (plaintiff did not have standing to pursue an order staying the collection of his daughter's past due tuition fees by the state because she was over the age of majority).

Moreover, although Tennessee does recognize a claim of promissory estoppel, it does not liberally apply the doctrine and limits its application to "exceptional cases." *Barnes & Robinson Co., Inc. v. OneSource Facility Services, Inc.,* 195 S.W.3d 637 (Tenn. App. 2006). Such exceptional cases are found only where defendant's conduct is akin to fraud. *Shedd v. Gaylord Entertainment Company,* 118 S.W.3d 695 (Tenn. App. 2003). In the instant case, Plaintiffs have not pled facts to support a finding that the University's conduct is the equivalent to fraud. Thus, the Court finds that Plaintiffs James Doe and Mary Doe have failed to plead sufficient facts to support a viable promissory estoppel claim against the University.

Plaintiffs James Doe and Mary Doe have also failed to establish that they have standing to sue as the intended beneficiaries of the contract between the University and John Doe. "Tennessee recognizes two kinds of third-party beneficiaries, intended and incidental. Only if a party is an intended beneficiary may it maintain an action to enforce the contract." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1356 (6th Cir. 1991).

-27-

For Plaintiffs James Doe and Mary Doe to establish they were an intended beneficiary of the University's contract with John Doe, they must establish the clear intent of the contract was to benefit them. *Id.* This clear intent "may be shown if there is either an expression in the contract that the contracting parties intended to benefit the third party . . . or proof that the promisor's performance will otherwise discharge a duty owed to a third party beneficiary by the promisee . . . ." *Id.* (citation and quotation omitted). Plaintiffs James Doe and Mary Doe, however, have not provided the Court express contractual language indicating that they were the intended beneficiaries nor cited any proof establishing the same. Accordingly, Plaintiffs James Doe and Mary Doe's contractual and quasi-contractual claims against the University will be **DISMISSED WITH PREJUDICE.**

### E.     The University's Objection to Magistrate's Memorandum and Order

On August 7, 2009, United States Magistrate Judge Susan K. Lee issued a Memorandum and Order granting Plaintiffs' Motion to Proceed Under Pseudonyms and for Protective Order. [Court Doc. 21] Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, the University has filed timely objections to this non-dispositive ruling. [Court Doc. 25].

The Court has reviewed *de novo* Magistrate Judge Lee's Memorandum and Order to which an objection has been made. Fed. R. Civ. Proc. 72(a). The Court finds that Plaintiff's objections raise no new arguments, but are simply a reargument of issues previously raised and which were fully addressed in the Report and Recommendation. The Court finds that further analysis of these same arguments would be merely cumulative and is unwarranted in light of Magistrate Judge Lee's well-reasoned and well-supported

Memorandum and Order.  Accordingly, the University's objections [Court Doc. 25] are **OVERRULED**.

## IV.      CONCLUSION

For the reasons explained above, Defendant's Motion for Partial Summary Judgment is **GRANTED**.  [Court Doc. 10.]  Counts III and IV of Plaintiffs Complaint are hereby **DISMISSED WITH PREJUDICE.**  Plaintiffs James Doe and Mary Doe's Contractual and Quasi-Contractual Claims against the University [Counts I, II, XII] are also **DISMISSED WITH PREJUDICE.**  The University's Objection to United States Magistrate Judge Susan K. Lee's Memorandum and Order granting Plaintiffs' Motion to Proceed Under Pseudonyms and for Protective Order [Court Doc. 25] is **OVERRULED.**

SO ORDERED this 13th day of October, 2009.

_____/s/Harry S. Mattice, Jr._____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE