UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

JOHN DOE, MARY DOE,           )
and JAMES DOE,                )
                            )
   *Plaintiffs*             )
                            )   Case No. 4:09-cv-62
v.                          )
                            )   Judge Mattice
THE UNIVERSITY OF THE SOUTH,   )
                            )
   *Defendant.*           )

## MEMORANDUM AND ORDER

Presently before the Court are Defendant's Motion for Summary Judgment [Court Doc. 76] ("MSJ") and Plaintiffs' Motion for Partial Summary Judgment [Court Doc. 77] ("MPSJ"), both filed on July 9, 2010.

In their motion, Plaintiffs argue that Defendant's sexual assault policies and procedures constituted a contract between the University and John Doe and, because the University repeatedly violated its own procedures in Doe's case, John Doe is entitled to an order granting summary judgment on his breach of contract claim (Count I).

Defendant, on the other hand, argues that, because it "substantially complied" with its written sexual assault policies and procedures and because those procedures were fair and reasonable as applied to John Doe, it is entitled to an order granting summary judgment and dismissing John Doe's contractual and quasi-contractual claims (Counts I, II, and XII). Defendant also argues that, as it owed no duty to James and Mary Doe and, to the extent it owed any duty to John Doe, it satisfied its obligations by substantially complying with its own procedure, the negligence claims (Counts V-IX) likewise should be dismissed. Finally, Defendant argues none of its behavior was "outrageous" as a matter

of law, and thus the infliction of emotional distress claims (Count IX-XI) must also be dismissed, resulting in the dismissal of the case as a whole.

On July 30, 2010, Plaintiffs filed their response to Defendant's Motion for Summary Judgment [Court Doc. 86] ("Pls.' MSJ Respon."), and Defendants filed their response to Plaintiff's Motion for Partial Summary Judgment [Court Doc. 87] ("Def.'s MPSJ Respon.") On August 6, 2010, Defendant filed its reply regarding its Motion for Summary Judgment [Court Doc. 91] ("MSJ Reply"), and Plaintiffs filed their reply regarding their Motion for Partial Summary Judgment [Court Doc. 90] ("MPSJ Reply").

On August 16, 2010, Defendant filed a Motion to Supplement Briefing [Court Doc. 92] with the authority of *Flowers v. Metro. Baptist Schs.*, 1997 WL 330644 (Tenn. Ct. App. June 18, 1997). On August 18, 2010, Plaintiffs filed a response [Court Doc. 93] objecting to Defendant's Motion to Supplement.

On that same day, August 18, 2010, Plaintiffs filed a Supplemental Brief in Support of Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment [Court Doc. 94], bringing to the Court's attention certain events occurring after their reply brief was filed. On August 25, 2010, Defendant filed its Response to Plaintiffs' Supplemental Brief in Support of Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment [Court Doc. 98].

Finally, associated with some of the substantive motions enumerated above Defendant also filed two motions for leave to file certain exhibits and certain portions of its memoranda under seal, one [Court Doc. 78] in relation to its Motion for Summary Judgment on July 9, 2010, and the other [Court Doc. 88] in relation to its Response to Plaintiffs' Motion for Partial Summary Judgment, on July 30, 2010.

For the reasons explained below, Defendant's Motion for Summary Judgment [Court Doc. 76] will be **GRANTED IN PART** and **DENIED IN PART**, Plaintiffs' Motion for Partial Summary Judgment will be **DENIED**, and Defendant's Motion to Supplement Briefing [Court Doc. 92] will be **DENIED**.

I.     **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment – and the Court to grant summary judgment – "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position by "citing to . . . materials in the record, including depositions, documents, . . . affidavits or declarations . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may bear this burden by either producing evidence that demonstrates the absence

of a genuine issue of material fact, or by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. To refute such a showing, the nonmoving party may not simply rest on its pleadings. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *see Anderson*, 477 U.S. at 249. The nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Celotex*, 477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Anderson*, 477 U.S. at 254. Thus, if the plaintiff must ultimately prove his case at trial by a preponderance of the evidence, the Court must, on a motion for summary judgment, determine whether a jury could reasonably find by a preponderance of the evidence that the plaintiff's factual contentions are true. *See id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.  FACTUAL BACKGROUND

As both the parties and the Court, in its October 13, 2009 Order Granting Defendant's Motion for Partial Summary Judgment [Court Doc. 34], have extensively covered the factual background of this case, in this Memorandum and Order the Court will provide limited factual exposition and will instead highlight a few particularly relevant events or factual disputes.

This action arises out of an early morning August 30, 2008 incident, after which a female university student (Complainant) accused Plaintiff John Doe of sexual assault. (Court Doc. 1, Compl. ¶¶ 31-32, 53, 62.) Later that morning, Complainant reported the incident to the Sewanee police, who notified the Dean of Students, Eric Hartman, who in turn told the police to notify Dean Mary Beth Walker (now Bankson). (Court Doc. 80, Unredacted Copy of Def.'s Mem. in Supp. of Def.'s MSJ Filed Under Seal at 3.) ("Def.'s MSJ Mem.") Complainant kept in contact with Dean Bankson and, on September 16, 2008, formally notified Dean Hartman that she would like to make a formal charge of sexual assault against Plaintiff John Doe in relation to the August 30 incident. That day, Dean Hartman appointed Dean Alexander Bruce as investigator.

The next day, September 17, 2008, Dean Hartman left a message that Doe should see him immediately, but Plaintiff did not receive that message until that evening and thus did not meet with Dean Hartman until September 18, 2008 at 10:00 a.m. (Court Doc. 81, Pls.' Mem. in Supp. of MPSJ ¶¶ 23-24) ("Pls.' MPSJ Mem.") At that meeting, Dean Hartman gave Plaintiff the "Faculty Discipline Committee Notification Report," which notified Doe (in its entirety):

[John Doe], you have been accused of Sexual Assault -- Category I. as a

result we request that you appear before the Discipline Committee on September 19 at 2:00 p.m. in the Regents' Room.
Witness(es): Officer Marie Gilliam [now Eldridge], Officer Brian Wiley, [male witness # 1 -- John Doe's friend], [male witness # 2 – John Doe's roommate].
Where the Infraction Occurred: Gorgas Hall.
Date and Time of the Occurrence: August 29, 2008
Other Information: [blank in report]
Source of Information: Statements.
Has the accused ever appeared before the Discipline Committee or been. subject to discipline resulting from violation or University Policy: No.

(Court Doc. 81-11, Ex. 11 to Pls.' MPSJ Mem.) (underlining added to indicate areas filled in by Dean Hartman and with the identities of the student witnesses obscured.)

In accordance with that notice, at 2:00 p.m. the next day, September 19, 2008, Dean Hartman and three members of Faculty Discipline Committee ("FDC") – consisting of Helen Bateman, Ph.D., a psychologist; John Shibata, Ph.D., a chemist; and Mark Preslar, Ph.D., a linguist, – conducted the disciplinary hearing, found that Doe was guilty of Category 1 Sexual Assault and recommended that result to Dean Hartman. (Def.'s MSJ at 14; Pls.' MPSJ ¶¶ 54, 71.) After this finding that he had committed sexual assault in violation of the University's Sexual Assault Policy and Procedures, the University presented Plaintiff John Doe with two options for punishment: (1) a one semester suspension with the sexual assault on his student record; or (2) withdrawal from the University for two semesters. (Compl. at ¶¶ 53, 62). The University imposed additional conditions for John Doe's return under either option, including re-application to and approval by the University Admission's Committee. (Id.) Plaintiff John Doe withdrew from the University with the possibility of returning in the fall of 2009. (Id. ¶ 63.) Plaintiff John Doe ultimately decided not to seek re-admission to the University. (Id.)

**A**.    **2008 Sexual Assault Policies and Procedures**

The University's Sexual Assault Policy, UOS-0049 to UOS-0054, is a six-page print out of the information on Defendant's website relating to the relevant procedures (Def.'s MSJ Ex. 8; Pls.' MPSJ Ex. 9) ("Sexual Assault Policy.") It has five sections – I. Conduct Standard, II. Options for Complainants, III. Procedures for a Formal Charge of Sexual Assault, IV. Support Services for Complainants, and V. Support Services for the Respondent – each dealing with a different aspect of the procedures. The "Conduct Standard" section defines "sexual assault" and "effective consent" and then gives some categories of examples of sexual assault. (*Id.*)

The "Options for the Complainant" section lists the "range of options available to a student who believes that she/he has experienced a sexual assault." (*Id.* at 1-2.) Importantly, two of the four different options delineated are

**Report Incident for No Contact Agreement**
The complainant may inform any of the deans of students of the alleged sexual assault. Through discussion with the dean, the complainant may request the establishment of a No Contact Agreement between the complainant and alleged respondent. While a No Contact agreement does not establish whether or not the alleged assault occurred, it does establish that the two students involved agree to have no further contact for a specified period of time. Both students must sign and pledge the agreement. An example of a No Contact agreement is provided below:

*From now until **(date to be determined)**. I, **(name of student)**, will have no contact with **(name of student)**. I will not contact the aforementioned student in person, via mail, via e-mail, via telephone, or any other means of communication nor will I engage in conversations about the aforementioned student. I further agree to maintain a reasonable distance from the aforementioned student so that I do not cause him/her discomfort or uneasiness. I understand that violation of this agreement will result in disciplinary action.*

The No Contact agreement will be kept on file in the Dean of Students office

for the time of the agreement and as long as the student is enrolled at the institution.

and

**Report Incident with Formal Charge of Sexual Assault**
Filing a formal charge of sexual assault against another student could result in formal disciplinary action, if the alleged respondent is found responsible. Possible sanctions include warning, probation, suspension. and expulsion. Students involved may also be required to attend appropriate drug or alcohol rehabilitation programs, or other types of counseling.

To file a formal charge of sexual assault. the complainant must inform one of the deans of students of the alleged sexual assault. This can be done in writing or in person. If a student chooses to make formal charges of sexual assault against another student the charges will be adjudicated in a hearing by the Faculty Discipline Committee.

(*Id.* at 2-3.) The third section establishes the actual procedures to be employed when a

student has elected to file a formal charge:

### III. Procedures for a Formal Charge of Sexual Assault

After a charge has been fired (as explained in section II), the following steps will occur:

**Appointment of an Investigator**: After a dean of students has received a formal charge of sexual assault the Dean of Students will typically be informed of the charge within 24 hours. Normally, the Dean of Students will appoint an investigator (one of the other deans) within 3 class days.

**Notification to respondent**: The Dean of Students will inform the respondent of the charges pending against him or her typically within 5 class days of learning that a formal charge is being pursued. At that time, the respondent will be informed of the services that are available to him or her (detailed below). Additionally, the respondent will be notified of the actual date and time of the hearing at least 24 hours prior to the hearing.

**Convening of the Faculty Discipline Committee**: The Faculty Discipline Committee is composed of the Dean of Students and four faculty members, whom are elected by the faculty, typically for a four-year term. The Dean of Students is the chair of the committee. There are no students on the Faculty Discipline Committee. Three members of the Faculty Discipline Committee

constitute a quorum and must be present at all stages of a hearing. Faculty Discipline Committee members who have a close relationship with the students involved or who are closely connected to the issue being adjudicated and who might, therefore, have a difficult time rendering impartial judgment should recuse themselves from the hearing. The committee member should discuss this possibility with the chair of the committee prior to a hearing. If a faculty member has a demonstrable personal bias for or against an accused and does not withdraw on his or her own initiative, the chair will submit the question to a vote by the other members of the committee. At the discretion of the chair, a faculty member who recuses himself/herself from the hearing may, nevertheless, be allowed to present a statement to the committee or serve as a character witness. (*The members of the Faculty Discipline Committee are as follows: Eric Hartman - Chair, Thomas Spacarelli, Tom Macfie, Helen Bateman, John Shibata, and Mark Preslar.)*

**Confidentiality**: Throughout the process for resolving a formal charge of sexual assault, reasonable efforts will be made to maintain the students' confidentiality. At different times in the process, however, it may be important to discuss the alleged incident with witnesses and/or others who have information that is pertinent to the case; or on a need-to-know basis. All students involved in the process are strongly urged to use discretion in discussing the incident or the identities of other student involved in the process. In a small community, public discussion of sexual assault cases can be very hurtful.

**Investigation**: The investigator will meet with each of the students involved in the alleged incident as well as any possible witnesses. The investigator will ask all parties involved in the case to submit a written statement regarding the incident; however, providing a written account is an option, not a requirement of the process. The investigator will present the reports to the members of the Faculty Discipline Committee prior to the hearing. The students will have an opportunity to see the other report/s at the beginning of the hearing. The investigation portion of the process typically takes 5- 10 class days.

**Character Witness**: The complainant and respondent are permitted to invite a member of the college community (faculty, staff, or student) to speak to their character during the official hearing. This witness will only be present at the hearing during his or her statement.

**Hearing Advisors**: The complainant and respondent may be accompanied in the hearing by his/her respective consultant (please see sections IV & V for more information about the consultant role). This consultant may not

speak aloud during the hearing, but he/she may confer quietly or by means of written notes with the complainant. It should be noted that the complainant/respondent is not obligated to accept the counsel offered by the consultant; the consultant offers advice and nothing more.

**Hearing Process**:
- Written statements are reviewed by the FDC.
- Character witnesses share verbal statements with the FDC.
- The complainant shares a verbal statement with the FDC; followed by any questions that the FDC may have for the complainant.
- The respondent shares a verbal statement with the FDC; followed by any questions that the FDC may have for the respondent.
- Any witnesses that have information pertaining to the incident will be given a chance to speak with, and be questioned by, the FDC.
- If necessary, the FDC may recall the complainant, respondent or any witness for further questioning.
- Hearing concludes. FDC deliberates in order to determine responsibility.

All students making statements to the committee will be reminded that the Honor Code applies to their statements. Non-students who provide statements will be reminded that honesty is imperative. The complainant and respondent will never be in the hearing room at the same time. Efforts will also be made to ensure that the students will not wait in the same area outside the hearing room. Hearings of the committee will not be recorded unless special permission is requested and granted by the chair.

**Determination of Responsibility**: The FDC will hold a closed meeting and will make a decision in the form of a recommendation to the Dean of Students who has authority to accept, modify, or reject the recommendation of the committee. The decision of whether or not a student is responsible for the alleged charges depends upon a "preponderance of evidence." A "preponderance of evidence" means that there is 51% certainty that the respondent is responsible for a violation of the sexual assault policy.

**Notification of decision and sanctions**: The Dean of Students will notify the respondent of the determination of responsibility as well as any sanctions that may apply. If the student is to be suspended and/or expelled, he or she must vacate campus within twenty-four hours.

The complainant will also be notified of the decision by the Dean of Students.

Proceedings and decisions of the committee will not be disclosed except on a need to know basis. All notes and written material from the hearing will be collected and held by the Dean of Students for five years, at which time they will be destroyed or, at the dean's discretion, preserved.

(*Id*. at 3-4.) The fourth section of the Sexual Assault Policy outlines support services for complainants. (*Id.* at 4-6.) Finally, the fifth section of the Policy outlines the "Support Services for the Respondent." These include referrals to Counseling Services, Academic Deans, Chaplains, and Residential Life Staff, but the most significant provision relates to the "Consultant for the Respondent (Hearing Advisor)," a faculty member who advises the Respondent and helps guide him or her through the process:

**Consultant for the Respondent (Hearing Advisor)**
The student accused of sexual assault may confer with a Consultant for the Respondent *(2007-2008 Consultants are: Larry Jones, Nancy Ladd, Christian Miller, and Max Obermiller)*. A consultant is familiar with the formal processes for hearing cases of sexual assault and may be helpful to the respondent. The consultant may attend the hearing with the respondent as outlined in Section III. Furthermore, all consultants are familiar with the following topics of discussion:

- The seriousness of the charge(s), procedure, and possible penalties if found responsible.
- The University's conduct standard for sexual assault.
- The University resources available to the respondent.
- The option of informing parents and guardians of the matter. Even though parents cannot participate in the campus hearing, they can provide moral support and advice.
- The option of consulting a lawyer. While an attorney cannot participate in an on-campus hearing, if the matter passes to the criminal or civil courts, legal counsel can be important.

There are limitations on the role of the Consultant to the Respondent.

- The Consultant must instruct the respondent, before they begin to talk, that he or she cannot provide absolute confidentiality; and he/she must state to the respondent that if he or she chooses to testify, that he or she should tell the truth. If despite this caveat, the respondent were to confess to wrongdoing, the Consultant would be obligated to inform the Dean of Students.

(*Id.* at 6.)

In the "Campus Safety" section of the website, the University also provides some

additional information on its Sexual Assault program, including available training and

resources. (Pls.' MPSJ Ex. 27 at 4.) Plaintiffs focus on the last paragraph in particular:

> Anyone who believes himself or herself to be the victim of a sexual offense or harassment can bring a complaint through the University's procedures detailed in the·Student Handbook and the Faculty/Staff Handbook. No one will be reprimanded or discriminated against in any way for initiating an inquiry or complaint in good faith. ***The University will also endeavor to protect the rights of any person against whom a complaint is lodged.*** At each step of the complaint process, the University's procedures seek to protect, insofar as possible, the privacy of individuals involved in a complaint. Both the accuser and the accused will be informed of the outcome of any institutional disciplinary proceeding brought alleging a sex offense, or harassment.

(*Id.*) (emphasis added.)

## B.  The Appeals Process

The appeals process is described separately in the "Student Policies" section of the

website and relates to all of the Dean of Students' decisions, not just sexual harassment

claims:

> An appeal of a Dean of Students' decision may be taken to the Dean of Students or, at the discretion of the Deans, to the Faculty Discipline Committee. It should be noted, however, that the appellate authorities generally give consideration only to those cases involving the most serious matters and the most significant consequences. Decisions of the Faculty Discipline Committee, following written notification to the student involved and a subsequent hearing to examine pertinent information and hear testimony, are made in the form of a recommendation to the Dean of Students who has authority to accept, modify, or reject the recommendation of the committee. In cases of suspension, expulsion or when the Faculty Discipline Committee has made a disciplinary recommendation in the exercise of its original jurisdiction, a student may appeal that decision to the Vice Chancellor.

> If a student wishes to appeal a decision of a Dean of Students, such an appeal must be made in writing to the appropriate person or committee within seventy-two hours after notification of the decision. An appeal to the Vice Chancellor from a decision of the Dean of Students for suspension or

expulsion must also be submitted within seventy-two hours. Should the penalty imposed by the Dean of Students involve suspension from the college, the requirement that a student leave campus within twenty-four hours of notification is not waived during an appeals process.

Procedures and Guidelines of the Student and Faculty Discipline Committees may be obtained in the Office of the Dean of Students.

(Pls.' MPSJ Ex. 25 at 3-4).

### C. Terms Disclaimer in 2008 Catalog

As evidenced by Plaintiffs' Supplemental Brief in Support of Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment [Court Doc. 94] and Defendant's Response [Court Doc. 98], the parties disagree strenuously over whether, at the time the instant claim arose, any of Defendant's materials it provided to its students – which materials inform the scope of the contractual relationship between the parties – contained the following disclaimer: "This catalog provides information which is subject to change at the discretion of the College of Arts and Sciences. It does not constitute any form of contractual agreement with current or prospective students or any other persons." (Def.'s MSJ Mem. at 30; Def.'s MPSJ Respon. at 6.)

Defendant's original source for the disclaimer was the current version of its website, which Plaintiffs noted and to which they objected in their response to Defendant's Motion for Summary Judgment. (Pls.' Suppl. Br. ¶ 2.) Plaintiffs contended that their 2008 edition of the relevant website did not contain such a disclaimer and that it was added later. (Pls.' MPSJ Respon. ¶ 2.) Plaintiffs complain that, despite on-point discovery requests, Defendant, "[i]n its reply brief (Doc. 91) – filed after plaintiffs filed their reply brief (Doc. 90) – the University asserted, for the first time, that a printed, hard-copy version of the

academic catalog contained the disclaimer. See Def. Reply at 11-12. In support of its assertion, the University attached, as Exhibit 2, an affidavit from its General Counsel, Donna Pierce, and a copy of the page from the 2008-2009 printed, hard-copy catalog." (*Id.* at ¶ 3.) Plaintiff John Doe argues that he "has no recollection of ever seeing the 400-page hard-copy version of the academic catalog." (Court Doc. 94-5, 2nd. Aff. of J. Doe ¶¶ 2-3.)

Defendant responds that it had revealed this much earlier to Plaintiffs: in its Response to the Court's September 1, 2009 Show Cause Order, filed September 16, 2009, the University stated that the disclaimer language appeared in "[t]he University's on-line catalog and print version." (Court Doc. 98, Def.'s Respon. to Pls.' Suppl. Br. ¶ 1.) Further, Defendant appended the declaration of Edith Morgan, head resident of Gorgas Hall, who "placed copies of the Catalog on the desks of the freshmen football players living in Gorgas, including Doe, the night before the regular arrival date for the freshmen class for the 2008--09 school year." (*Id.* at ¶ 3.)

The dueling affidavits, declarations, and date-stamped copies of the website provide more than enough evidence from which the Court can find that the presence – and/or availability to John Doe – of this disclaimer language in 2008 is a disputed issue of material fact.

## III.    PROCEDURAL HISTORY

On June 3, 2009, John Doe and his parents, James and Mary Doe, filed the Complaint [Court Doc. 1], asserting twelve different causes of action (for each plaintiff) and requesting injunctive relief and compensatory and punitive damages. These counts can be grouped into four categories:

1.   Contractual and Quasi-Contractual Claims: Count I (Breach of Contract),

Count II (Promissory Estoppel), and Count XII (Unjust Enrichment);

2. Title IX/Clery Act Claims: Count III (Declaratory Judgment – Title IX and Clery Act) and Count IV (Title IX – Damages);

3. Negligence claims: Count V (Negligence), Count VI (Negligence *Per se*), Count VII (Gross Negligence), Count VIII (Negligent Training and Supervision of Employees), and Count IX (Negligent Infliction of Emotional Distress); and

4. Infliction of Emotional Distress claims: Count X (Reckless Infliction of Emotional Distress) and Count XI (Intentional Infliction of Emotional Distress).

On July 17, 2009, Defendant filed a Motion to Dismiss [Court Doc. 10], seeking to dismiss Plaintiffs' claims based upon Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX") and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f) (the "Clery Act."). While considering this motion, on September 1, 2009, the Court ordered [Court Doc. 30] the parties to submit briefs on "whether Plaintiffs have alleged sufficient facts that would establish that Defendant had explicitly or implicitly entered into a contractual or quasi-contractual relationship with James Doe and Mary Doe" and have standing to pursue such claims against the University. Then, on October 13, 2009, it granted Defendant's motion – dismissing Counts III and IV as to all parties – and dismissed Counts I, II and XII at to James and Mary Doe after finding that they lacked the standing to assert any such claims. [Court Doc. 34]. Thus, after this Order, John Doe's contractual and quasi-contractual claims (Counts I, II, and XII), all Plaintiffs' negligence claims (Counts V-IX), and all Plaintiffs' emotional distress claims (Count X-XI) remained at issue in the case.

On July 9, 2010, both Plaintiffs [Court Doc. 77] and Defendant [Court Doc. 76] filed motions for summary judgment. In their memorandum in support of their motion [Court

Doc. 81], Plaintiffs outline the "material facts not in dispute" in detail and then argue that not only do the sexual assault policies and procedures constitute a contract between the University and John Doe, but the University repeatedly violated its own procedures in Doe's case, and thus John Doe is entitled, at this time, to an order granting summary judgment on his breach of contract claim (Count I).

In Defendant's memorandum in support of its motion, Defendant argues that because it "substantially complied" with its written sexual assault policies and procedures, which procedures were fair and reasonable as applied to John Doe, John Doe's contractual and quasi-contractual claims must now be dismissed.(Def.'s MSJ Mem.) Further, Defendant argues, the negligence claims must also be dismissed, as it owed no duty to James and Mary Doe and, to the extent it owed any duty to John Doe, it satisfied its obligations by substantially complying with its own procedures. (*Id.*) Finally, Defendant argues that the infliction of emotional distress claims must be dismissed because its conduct was not "outrageous" as a matter of law. (*Id.* at 39.) Each party's briefing in response (submitted July 30, 2009) and in reply (submitted August 6, 2009) reiterated these same points.

Finally, the parties filed several accessory motions related to these substantive motions, including:

1. Defendant's Motion to Supplement Briefing [Court Doc. 92] – filed on August 16, 2010 and objected to by Plaintiffs [Court Doc. 93] on August 18, 2010;

2. Plaintiffs' Supplemental Brief in Support of Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment [Court Doc. 94], filed August 18, 2010 and responded to by Defendant [Court Doc. 98] on August 25, 2010; and

3. Defendant's two motions for leave to file certain exhibits and portions of its memoranda under seal, one [Court Doc. 78] relating to its Motion for Summary Judgment and filed on July 9, 2010, and the other [Court Doc. 88] relating to its Response to Plaintiffs' Motion for Partial Summary Judgment and filed on July 30, 2010.

These matters are now ripe for review. Further, as Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment were not only submitted at the same time, but also both turn, in large part, on shared issues of fact and law – the content of the University's policies, whether those policies created a contractual relationship with John Doe, and whether the University fulfilled any obligations imposed by those policies – it is appropriate to consider these motions together. Although Defendant's motion for summary judgment adds issues of the "outrageousness" and the duties owed to the parents, discussion of those topics accounted for less than one-quarter of its brief; in addition, Plaintiffs' response fully addressed these "additional" issues, in part by providing short cross-references to arguments made in their Motion for Partial Summary Judgment in order to reserve the majority of their argument (almost two-thirds of their response) for the negligence and emotional distress claims.

Accordingly, the Court will address both motions for summary judgment, and all related motions, in this Memorandum and Order.

IV.    **ANALYSIS**

A.  **Defendant's Motion to Supplement Briefing**

In its Motion to Supplement Briefing [Court Doc. 92], Defendant asks for leave to supplement its summary judgment briefing with the authority of *Flowers v. Metro. Baptist Schs.*, 1997 WL 330644 (Tenn. Ct. App. June 18, 1997), because "*Flowers* may be

controlling authority here, *see Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir. 1989), and the University wishes to bring the opinion to the Court's attention." (Def.'s Mot. to Suppl. MSJ.) Plaintiffs respond that, aside from having no application to this case, as it involved a high school student and drug charges (Pls.' *Flowers* Respon. ¶¶ 4-5), because "*Flowers* is a 'Memorandum Opinion,' a term with a specific meaning under the Rules of the Court of Appeals of Tennessee . . . [that it] shall not be cited or relied on for any reason in any unrelated case," it "has 'no precedential value,' . . . [and] cannot be 'controlling authority here.'" (Pls.' *Flowers* Respon. ¶¶ 2-3) (citing Tenn. Ct. App. R. 10.)

This Court typically does not find surreplies or other supplemental briefs to be useful or appropriate. Further, *Flowers* was decided more than a decade ago, was available to Defendant at the time it submitted its summary judgment briefing, and could have been incorporated at that point. Finally, any precedential value and utility of the *Flowers* decision appears to be limited, as noted by Plaintiffs. Accordingly, Defendant's Motion to Supplement Briefing [Court Doc. 92] will be **DENIED**.

### B.  Defendant's Motions for Leave to File Documents Under Seal

Defendant's Motion for Leave to File under Seal Certain Exhibits Attached to Defendant's Motion for Summary Judgment and Certain Portions of the Memorandum of Law in Support of the Defendant's Motion [Court Doc. 78] and Defendant's Motion for Leave to File under Seal Certain Exhibits Attached to Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment [Court Doc. 88] both seek leave from the Court to file under seal certain sensitive information – "personally identifiable information" contained in "education records," within the meaning of the Family Educational Rights and Privacy

Act, 20 U.S.C. § 1232g ("FERPA") and information that would tend to identify Plaintiffs. Both of these disclosures by the University are prohibited, the first by FERPA and the second by United States Magistrate Judge Susan K. Lee's Memorandum and Order granting Plaintiffs' Motion to Proceed Under Pseudonyms and for Protective Order. [Court Doc. 21 at 7] ("Protective Order") ("Defendant **SHALL NOT** identify any Plaintiff to any nonparty other than as may be necessary to defend against this action."), objections to which this Court has already overruled while noting that further analysis would be "merely cumulative and [ ] unwarranted in light of Magistrate Judge Lee's well-reasoned and well-supported [Protective Order]." (Court Doc. 34, October 13, 2009 Order.)

Accordingly, and for good cause shown, Defendant's Motion for Leave to File under Seal Certain Exhibits Attached to Defendant's Motion for Summary Judgment and Certain Portions of the Memorandum of Law in Support of the Defendant's Motion [Court Doc. 78] and Defendant's Motion for Leave to File under Seal Certain Exhibits Attached to Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment [Court Doc. 88] will be **GRANTED**.

### C. "Retrying" the Underlying Dispute

As the Court noted in its Memorandum and Order Granting Defendant's Motion for Partial Summary Judgment [Court Doc. 34]:

> This is not a lawsuit between the Complainant and the Plaintiffs. This Court is not asked to make an independent determination as to what happened between the Plaintiff John Doe and the Complainant on August 30, 2008. The Court therefore expresses no opinion as to whether a sexual assault occurred, whether any such acts were consensual, or who, as between John Doe and the Complainant is credible. In short, the instant lawsuit does not call for a judicial determination

-19-

either in favor or against John Doe's claims or in favor or against the Complainant, regarding the merits of her claims.

(Court Doc. 34 at 12.) (*Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009)). Despite this admonition, Plaintiffs spend a good deal of their briefing discussing "disputed facts" – whether Officer Wiley's testimony as to Complainant's intoxication is material or admissible (Pls.' MSJ Respon. 3-4), whether Complainant knocked her head on a bed (*Id.* at 5), Complainant's alcohol consumption that evening (*Id.* at 6-7), etc. – that relate solely to this underlying event.

Defendant rightly complains of Plaintiffs repeatedly disputing "facts" that have relevance only to the underlying dispute between Plaintiff and Complainant – particularly where Plaintiffs dispute these facts in an attempt to introduce a "gatekeeper" requirement neither found nor implicitly imposed anywhere in the University's guidelines, and thus not at issue to the contractual and quasi-contractual claims. The manner in which they then characterize Plaintiffs' litigation strategy and the Court's role in the case is incorrect, but illuminating:

> Doe attempts to disguise the true intent of this lawsuit by alleging supposed "deficiencies" in the University's disciplinary proceeding on A.B.'s complaint. But these purported "deficiencies" only underscore that Doe is simply unhappy with the process he received-the process that he reviewed and accepted upon enrolling at the University. . . . It cannot be overemphasized that what the Court is asked to do in this case is review a private university's disciplinary proceeding in which the university determined a student violated the school's code of conduct. The precedents strictly limit a court's power in cases like this to determining whether the private school substantially complied with its established disciplinary policies and procedures.

(*Id.* at 1-2.)

This goes to the heart of Plaintiffs' claims, and to why neither Plaintiffs' nor Defendant's motions for summary judgment as to the contractual claims will be granted. Doe does attempt to import some rights not found in the Sexual Assault Policies and Procedures into the hearing process, but generally his allegations center on the fact that he believed that he would, if and at the time for a disciplinary hearing arose, be entitled to the process outlined in the University's materials. Plaintiffs argue that the University did not live up to its own procedures in many ways, and that these "deficiencies" were significant to the point that they could have changed the outcome.

Defendant's arguments as to the Court's powers of review seem to regard its disciplinary proceedings as quasi-judicial proceedings entitled to arbitration-like deference and immune from all but the most cursory judicial review, rather than simple claims sounding in contract and tort. This is an incorrect apprehension of the law. Courts not only entertain actions sounding in contract and quasi-contract related to the sufficiency of the process related to school disciplinary proceedings, but where those proceedings involve actual punishment as opposed to making purely academic judgments, the Court's inquiries are even more searching.

Further, Defendant repeatedly asserts that the Court's earlier admonition that this case comes before it in a limited posture means that it cannot review the way in which the University conducted the process. Nothing in the Court's earlier (and now repeated) statements that it would not reach the merits of the underlying dispute between Doe and Complainant mean that the Court will not evaluate any factual discrepancies as they relate to Plaintiffs' claims sounding in contract and tort. In fact, some of Plaintiffs' discussions of these factual disputes actually go to other evidentiary issues, such as the quality of the

investigation, rather than the quality of the outcome. For example, Plaintiffs tie the dispute

over who, John Doe or Complainant, knocked over the bed to the element of their breach

of contract claim addressing the obligation to conduct an investigation appropriately:

> This "fact" is very much in dispute . . . [and] the "witness" on
> whose "testimony" this "fact" is based did not even see the
> event in question. The flaw here relates to the lack of
> competent investigation and not to a desire on the part of
> plaintiffs to have this Court second-guess the decision of the
> Faculty Discipline Committee.

(*Id.* at 5.) This kind of "impeachment" use – that is, using discrepancies between

information available in 2008 but neither uncovered in the investigation nor before the

Discipline Committee in 2008 to highlight weaknesses in the competence of the

investigation or to attack the impartial nature of the hearing – is one of the few acceptable

uses of analyzing the facts surrounding the underlying incident. But any use of "disputed

facts" to assess the merits of the Discipline Committee's findings is still, and will remain,

irrelevant to this lawsuit.

### D. Negligence Per se

Plaintiffs continue to assert negligence per se claims, arguing that "34 C.F.R.

106.8(b) . . . requires a school receiving Title IX funds to establish 'procedures providing

for the prompt and equitable resolution of student complaints' relating to all forms of sexual

harassment, including sexual assault," and that this regulation incorporates an Office of

Civil Rights of the Department of Education (OCR) Guidance requiring a school's

procedures to "accord[ ] due process to both parties involved." (Pls.' MSJ Respon. at 44.)

Plaintiffs cite *Teal v. E.I DuPont de Nemours & Co.*, 728 F.2d 799, 802 (6th Cir. 1984), for

the proposition that a federal regulation (an OSHA regulation in *Teal*) "established an

enforceable duty" and thus, since Plaintiffs are "members of the class of persons the regulation was intended to protect," any breach of 34 C.F.R. 106.8(b) is negligence per se.

Plaintiffs' arguments fail on several grounds, but most importantly, their arguments would vitiate the Supreme Court's ruling in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998). In that case, the Court, interpreting precisely the same regulation at issue here, 34 C.F.R. § 106.8(b), said that "the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX. Of course, the Department of Education could enforce the requirement administratively . . . [but] we have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements." *Id.* at 292. If the Court were to allow a regulation used in administering a federally-created right to create a state negligence per se claim, it would effectively eviscerate the *Gebser* rule.

In fact, Defendant noted in its motion for summary judgment that Plaintiffs' strategy of "mak[ing] an end run around these principles by asserting state-law negligence-based claims and relying on Title IX regulations and OCR Guidance to establish the duty element of those claims . . . [is] preempted by the Supreme Court's jurisprudence on the private right of action under Title IX" (Def.'s MSJ Mem. at 36, citing *Kemp v. Medtronic, Inc.*, 231 F.3d 216 (6th Cir. 2000)). Accordingly, Plaintiffs' Negligence Per Se Claims (Count VI) will be **DISMISSED WITH PREJUDICE**.

### E. Duty Owed to Mary and James Doe

All negligence claims require that a plaintiff establish first and foremost a duty of care owed to plaintiff by defendant, *West v. East Tenn. Pioneer Oil Co.*, 172 S.W.3d 545,

550 (Tenn. 2005), but Plaintiffs Mary and James Doe have not pointed to any relevant case law establishing any legal duty a private university would have towards the parents of an adult student.

They cite *Satterfield v. Breeding Insulation Co.*, 266 S. W.3d 347, 362-63 (Tenn. 2008) for the proposition that "[e]ven when the actor and victim are complete strangers and have no relationship, the basis for the ordinary duty of reasonable care . . . is conduct that creates a risk to another. Thus, a relationship ordinarily is not what defines the line between duty and no-duty; conduct creating risk to another is." In *Satterfield*, however, the estate of an employee's daughter who had died of mesothelioma was suing her father's employer for negligence, alleging that his employer had negligently permitted their employee to wear his asbestos-contaminated work clothes home from work, thereby regularly and repeatedly exposing employee's daughter to asbestos fibers over an extended period of time. The factual differences between that case – the regular exposure of a minor child living in regular and repeated proximity to clothes shedding a known carcinogen – and this case make the analogy so attenuated as to be useless.

Further, the "evidence" that Mary and James Doe use to establish the fact that they "were far from 'strangers' to the University," actually militates against their argument. For instance, they cite the fact that the Sexual Assault Policies and Procedures suggest that the  consultant/hearing advisor should discuss with the accused "[t]he option of informing parents and guardians of the matter. Even though parents cannot participate in the campus hearing, they can provide moral support and advice." (Sexual Assault Policy at 6.) This Policy language James and Mary Doe cite discussing parental involvement, however, is clearly speaking from the perspective of whether parental involvement will be helpful for

the *student*, the individual with whom the University actually has a relationship, and not out of a concern for the parents' rights or feelings. For example, the "Advising and Counseling" language – "encouraging parents to communicate directly with their son or daughter if they are concerned about a problem or a decision he or she is about to make" but saying "at the same time, parents will find college faculty and staff very willing to consult with them when this is feasible, not a violation of privacy, and consistent with college policies and expectations" – most clearly seems to suggest to parents to keep their concerns regarding their adult-children-students outside of the University's domain ("feasible"), in part by reminding the parents that the University frequently will not be able to discuss issues relating to the student because it would implicate the privacy concerns of the student, i.e. the individual with whom it has a relationship.

Accordingly, the Court finds that Plaintiffs Mary and James Doe have not established a duty of care owed to them by Defendant, and thus all their claims premised upon a negligence theory and not already dismissed (Count V (Negligence), Count VII (Gross Negligence), Count VIII (Negligent Training and Supervision of Employees), and Count IX (Negligent Infliction of Emotion Distress) will be **DISMISSED WITH PREJUDICE**.

### F. Reckless and Intentional Infliction of Emotional Distress

Under Tennessee law, a plaintiff must establish the following elements to support a claim for reckless or intentional[1] infliction of emotional distress: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that

---

[1] The elements of Reckless Infliction of Emotional Distress and Intentional Infliction of Emotional Distress are identical except the intent element. As the Court will be focusing on the second and third elements, it will handle these claims in the same fashion.

it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Tennessee courts have further explained:

> In describing these elements, we have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (internal citations and quotation marks omitted).

Here, Plaintiffs have not presented sufficient evidence to establish that Defendant's actions constituted either a reckless or an intentional infliction of emotional distress. As the factual bases of their claims, they rely upon:

> (1) the intentional hiding of exculpatory evidence from John Doe; and (2) the admission by Hartman to Mary Doe that [Complainant's] prescription psychotropic medications and psychological conditions played a significant role in the Committee's decision in spite of (a) the Committee's total lack of knowledge on the subject; and (b) absolutely no evidence that John Doe knew anything about the medications or the psychological conditions.

(Pls.' MSJ Respon. at 45-46.)

In this regard, the Court would first note that Plaintiffs mischaracterize the evidence. Plaintiffs claim evidence relating to Complainant's usage of legally-prescribed drugs is "exculpatory" because they have an expert who asserts the drugs' effects in concert with alcohol would make her appear less incapacitated than she really was. (Pls.' MPSJ Mem. at 34-36). There is, however, conflicting expert testimony asserting that Complainant would

instead have appeared much *more* intoxicated, given the mix of drugs and alcohol. (Def.'s MPSJ Respon. at 19-21.) This conflict serves not only to refute the notion that the disclosure of Complainant's medication would be "exculpatory," but also serves to point out that seeking outside medical expert testimony (which, as Plaintiffs acknowledge, had never been done before) would not necessarily have illuminated the discussion, as apparently experts differ on this point, even if the contract had imposed a duty on the University to obtain expert medical assistance (which it does not).

In addition, it is clear that Defendant's experts were considering her alcohol and drug intake in light of her observable (through others' testimony) behavior, not just looking at what her ability to consent was at a clinical level, just as the FDC panel members did in the original hearing. (*Id.*) That is, Defendant's experts' conclusions about the drugs' effects supported the inference that she was incapacitated, which itself serves as some validation of the weight the FDC panel members had accorded testimony as to her behavior.

Much more importantly, though, nothing about the "failure to disclose" was intentional. The procedures do not provide for the hearing participants to disclose publicly the bases for their findings, their notes, or additional materials submitted to them. As will be discussed below, if one reads the Sexual Assault Guidelines to impose an affirmative duty on a party where they use words mandating an action, such as "shall" or "will,"[2] the only affirmative duties the University owes the Respondent are ones like the duty to inform the respondent of the services that are available to him and to notify him of the actual date

---

[2] *C.f., Plaut v. Spendthrift Farm, Inc.*, 1 F.3d 1487, 1490 (6th Cir. 1993) ("Where the word 'shall' appears in a statutory directive, 'Congress could not have chosen stronger words to express its intent that [the specified action] be mandatory') (citing *United States v. Monsanto*, 491 U.S. 600, 607 (1989)).

and time of the hearing at least 24 hours prior to the hearing. (Sexual Assault Guidelines at 3); to have the Investigator meet with the Respondent (*Id.*); notifying the Respondent of the outcome of the hearing (*Id.* at 4); having the Consultant tell the Respondent "before they begin to talk, that he or she cannot provide absolute confidentiality" (*Id.* at 6.) Because there is nothing in either the appeals process or the sexual assault guidelines that requires the University to provide the Respondent after the hearing with any information or copies of information introduced during the hearing, Defendant's failure to do so cannot be deemed an intentional act of hiding information. Further, Plaintiffs have not cited caselaw[3] or suggested anything specific in the provisions that incorporates a *Brady*-like duty to disclose any potentially exculpatory evidence to the Respondent in a private postsecondary education disciplinary hearing context.

Finally, even if the prescription drug material did tend to exculpate John Doe, Plaintiffs have failed to show any actual harm. As they themselves acknowledge: "[t]estimony ***at the hearing revealed*** A.B.'s use of prescription medication, including psychotropic drugs, as well as the psychological conditions from which she suffered." (Pls.' MPSJ Mem. at 33) (emphasis added). There is no indication, as far as the Court can tell, that anyone besides the Complainant knew of her medications and their relationship to the proceeding. The FDC heard and considered the information, along with all the other evidence, in making their recommendation, as did Dean Hartman in making his decision. Even if they had opened their files to Plaintiff, it would only have affected his appeal, and, as has been noted, the Appeals Process gives him absolutely no detailed rights – just the

---

[3] Given the difference between the pleading burdens at the motion to dismiss and summary judgment stage, Plaintiffs' citation to *McCormick v. Dresdale*, 2010 WL 1740853 (D.R.I. 2010) is inapposite.

right to appeal and a deadline of 72 hours to file the appeal.

Neither of the only two pieces of evidence Plaintiffs' cite as "outrageous" are, in the Court's view, even accurately portrayed as "wrongful," let alone conduct "so outrageous that it is not tolerated by civilized society." Accordingly, Plaintiffs' Reckless (Count X) and Intentional (Count XI) Infliction of Emotional Distress claims will be **DISMISSED WITH PREJUDICE**.

### G. Contractual and Quasi-Contractual Claims:

A breach of contract claim has three elements: 1) the existence of an enforceable contract; 2) nonperformance amounting to a breach of the contract; and 3) damages caused by the breach of the contract. *Atria v. Vanderbilt Univ.*, 142 F. App'x 246 (6th Cir. 2005) (citing *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. Partnership, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir.1996) (applying Tennessee law)).

In this case, the Court has already determined that there is a disputed issue of material fact as to whether the 2008 Sexual Assault Policies and Procedures, as published on the University's website, either contained a disclaimer or should be read in conjunction with a disclaimer that allegedly appeared in the catalog in 2008 ("This catalog provides information which is subject to change at the discretion of the College of Arts and Sciences. It does not constitute any form of contractual agreement with current or prospective students or any other persons."). But, even if the disclaimer were firmly established, and there was no express written contract, as in *Ku v. State*, 104 S.W.3d 870, 876 (Tenn. Ct. App. 2002), "its provisions may be enforced in Tennessee if it creates an implied contract." *Atria*, 142 F. App'x at 255 (citing *Givens v. Mullikin ex rel. Estate of*

*McElwaney*, 75 S.W.3d 383, 405 (Tenn. 2002)).

Further, it is long-settled in the Sixth Circuit that "the student-university relationship is contractual in nature although courts have rejected a rigid application of contract law in this area." *Doherty v. S. College of Optometry*, 862 F.2d 570, 577 (6th Cir.1988). Finally, the Court may consider "catalogs, manuals, handbooks, bulletins, circulars and regulations of a university [to] help define this contractual relationship." *Atria*, 142 F. App'x at 255.

In Tennessee, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003) (citing *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App.1987); Tenn. Code Ann. § 47-1-203 (imposing an obligation of good faith and fair dealing upon parties in the performance or enforcement of contracts)). The nature of the duty "depends upon the individual contract in each case." *Id.* Under Tennessee law, however, a breach of the duty of good faith and fair dealing "is not a cause of action in and of itself but as a part of a breach of contract cause of action." *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000); see also Tenn. Code Ann. § 47-1-203 ("This section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract . . . ."); *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003) ("Breach of the implied covenant of good faith and fair dealing is not an independent basis for relief.").

Although Defendant argues that the Court's review is extremely circumscribed, the Sixth Circuit has made clear that where the Courts are examining decisions based upon

disciplinary factors – rather than academic – the usual, very deferential, standard does not apply. *Doherty*, 862 F.2d at 577. Further, Defendant's repeated reliance on the "substantial compliance" standard, and in juxtaposition to traditional Tennessee and Sixth Circuit contract law, is misplaced, as there are genuine disputes as to material facts as to whether Defendant even substantially complied with its own clearly-stated procedures, let alone some of the rights Plaintiff believes are imported into the contract by implication.

For instance, one of the clearest examples of a provision that the University did not comply with, at least in full, and may have not complied with even substantially is the language addressing the role of the investigator:

> The investigator ***will*** meet with ***each*** of the students involved in the alleged incident as well as ***any possible*** witnesses. The investigator ***will ask all parties*** involved in the case to submit a written statement regarding the incident; however, providing a written account is an option, not a requirement of the process. The investigator will present the reports to the members of the Faculty Discipline Committee prior to the hearing. The students will have an opportunity to see the other report/s at the beginning of the hearing. The investigation portion of the process ***typically takes 5- 10 class*** days.

(Sexual Assault Policy at 3-4) (emphasis added). It seems to make explicit a promise that the investigator not only will meet with the Complainant and Respondent but also with ***any*** possible witness, which would definitely include ***any possible*** witnesses identified by the already-identified witnesses, including the Complainant and John Doe. Not only did that not happen in this case, but Dean Hartman affirmatively ordered the investigator not to follow that policy. (Pls.' MSJ Mem. at 26-27.) Further, the language about the investigation typically taking 5-10 class days could be read by a reasonable juror to mean that this investigation, conducted in less than one day, was a breach of the overall contract.

Even as to more tenuous claims, such as Plaintiffs' contention that Defendant had a duty to seek expert medical testimony, even though Plaintiffs mischaracterized the facts in an attempt to have them deemed "outrageous" and even though the terms of the Sexual Assault Policy do not explicitly mandate such testimony, a reasonable juror could conclude in this case, just as in *Atria*, that the University's decision to seek out and then accept medical expert testimony as to *some* evidence (the vaginal abrasions), but not others (Complainant's prescriptions) "was an arbitrary decision and a breach of its implied contract."*Atria*, 142 F. App'x at 247; Pls.' MSJ Mem. at 33-36.

Regardless, the record is replete with competent summary judgment evidence evincing genuine issues of disputed fact as to particular breaches (whether Plaintiff had a right to be present during the hearing or whether allowing Complainant both to seek a no contact agreement and a formal charge effectively eliminated Plaintiff's ability to contact witnesses on his own behalf, just to name a few), and thus summary judgment is inappropriate on the breach of contract claim.

Defendant's arguments as to the quasi-contractual claims – promissory estoppel (Count II) and unjust enrichment (Count XII) – relied largely on a finding of no breach of contract; thus only two minor issues need to be discussed to address these claims fully.

First, Defendant argues that the disclaimer in the catalog effectively forecloses a promissory estoppel claim. (Def.'s MSJ Mem. at 30.) As has already been noted, the existence, presence, and impact of that disclaimer are all rigorously contested issues, supported by competent evidence. Therefore, the alleged disclaimer does not support summary judgment at this stage.

Second, as noted in the Court's ruling on Defendant's Motion to Dismiss [Court Doc. 34], the requirements for recovery under an unjust enrichment theory are as follows: (1) there must be no existing, enforceable contract between the parties covering the same subject matter, *Robinson v. Durabilt Mfg. Co.*, 260 S.W.2d 174, 175 (1953); (2) the party seeking recovery must prove that it provided valuable goods and services, *Moyers v. Graham*, 83 Tenn. 57, 62 (1885); (3) the party to be charged must have received the goods and services, *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991); (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.*, 595 S.W.2d 474, 482 (Tenn. 1980); and (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them. *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 154 (Tenn. 1966).

In this case, there are several unresolved assertions, supported by evidence but contested by Defendant, that Defendant's behavior as to some of the particular intentional violations (as with the allegation that Dean Hartman is implementing a policy directly contravening the written one as to interviewing parties) which, if accepted, could render strict application of the University's refund provision unjust and inequitable. In essence, Defendant's argument hinges on its having substantially complied with its policies, and, as has been noted, that has not yet been established.

On each of the particular disputed terms or rights, as demonstrated above with the investigation provision, both parties have presented competent summary judgment

evidence that raises genuine disputes as to material facts, and thus summary judgment is inappropriate at this time. Accordingly, Defendant's Motion for Summary Judgment [Court Doc. 76] ("MSJ") will be **DENIED** as to John Doe's Contractual and Quasi-Contractual Claims (Counts I, II, and XII), and Plaintiffs' Motion for Partial Summary Judgment [Court Doc. 77] will be **DENIED**.

### H. Negligence

A negligence claim requires that a plaintiff establish: (1) a duty of care owed to plaintiff by defendant; (2) conduct falling below that standard of care resulting in a breach of duty by defendant; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause. *West v. East Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005).[4]

In this case, Defendant in essence argues that whatever duty it owes its student in conducting its disciplinary proceedings, it has satisfied by its substantial compliance with those proceedings. (Def.'s MSJ Mem. at 31; Def.'s MSJ Reply at 12-14.) As has already been explained, there are a number of genuine disputes as to material facts currently precluding a finding that Defendant in fact substantially complied with its Sexual Assault

---

[4] Defendant argues that Plaintiff must demonstrate special proof that he has suffered a "severe emotional injury," in order to recover on the Negligent Infliction of Emotional Distress (NIED) claim. (Def.'s MSJ Mem. at 38-39; Def.'s MSJ Reply at 19.) If Plaintiff's NIED claim was a "stand-alone" claim, unconnected to the other allegations in the lawsuit, Defendant would be correct to cite the evidentiary rule announced in *Camper v. Minor*, 915 S.W.2d 437 (Tenn.1996).

Plaintiff John Doe's NIED claim, however, is clearly linked to or "parasitic" on the other substantive claims. In *Camper*, the Tennessee Supreme Court "abandoned the traditional 'physical manifestation' rule . . . [and i]nstead, we concluded that cases of negligent infliction of emotional distress should be analyzed under the 'general negligence' approach," but limited recovery for NIED claims "to serious or severe emotional injury supported by expert medical or scientific proof." *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 136-37 (Tenn. 2001) But, then in *Estate of Amos*, the Tennessee Supreme Court held that "[t]he special proof requirements in *Camper* are a unique safeguard to ensure the reliability of 'stand-alone' negligent infliction of emotional distress claims. [But] when emotional damages are a 'parasitic' consequence of negligent conduct that results in multiple types of damages, there is no need to impose special pleading or proof requirements that apply to 'stand-alone' emotional distress claims, " *Id.* at 136-37. Therefore, Plaintiff John Doe has sufficiently plead his NIED claim.

Policy-mandated procedures. Further, and contrary to Defendant's contentions, the Sixth

Circuit's opinion in *Atria* is again instructive. Although the questions as to the appropriate

standard of care there related to the precise way in which to return a test, rather than how

to conduct a sexual assault investigation and disciplinary proceeding, the *Atria* court noted:

> However, the fact that it may be difficult to establish "precise criteria" by which to judge a defendant's actions does not mean that the defendant owes others no duty. *See Stehn v. Bernarr MacFadden Foundations, Inc.*, 434 F.2d 811, 815 (6th Cir.1970). Vanderbilt and its agents owe everyone, including Atria, a duty to refrain from conduct that poses an unreasonable and foreseeable risk of harm. In Tennessee "[a]ll persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others. Thus, it has been said that duty is the legal obligation that a defendant owes a plaintiff to conform to a reasonable person standard of care in order to protect against unreason-able risks of harm." *Burroughs v. Magee,* 118 S.W.3d 323, 329 (Tenn.2003) (internal citations omitted). In other words, "a duty of reasonable care exists if defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property ... A risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.1995). The duty of due care applies to a plaintiff's property as well as his person. *Id; Smith v. Roane-Anderson Co.*, 30 Tenn.App. 458, 207 S.W.2d 353, 355 (1947).

*Atria*, 142 F. App'x at 251. As in that case, in this case a jury could find that the harm

caused by the University's allegedly and arguably haphazard implementation of its own

Sexual Assault Policies  was foreseeable, especially where here, as there, the harm was

severe: a wrongful conviction by a disciplinary committee.

Accordingly, Defendant's Motion for Summary Judgment on negligence claims as

they relate to Plaintiff John Doe will be **DENIED**.

**V.     CONCLUSION**

For the reasons explained above:

(1)     Defendant's Motion for Leave to File under Seal Certain Exhibits Attached to Defendant's Motion for Summary Judgment and Certain Portions of the Memorandum of Law in Support of the Defendant's Motion [Court Doc. 78] and Defendant's Motion for Leave to File under Seal Certain Exhibits Attached to Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment [Court Doc. 88] are hereby **GRANTED**;

(2)     Defendant's Motion to Supplement Briefing [Court Doc. 92] is hereby **DENIED**;

(3)     Plaintiffs' Motion for Partial Summary Judgment [Court Doc. 77] is hereby **DENIED**; and

(4)     Defendant's Motion for Summary Judgment [Court Doc. 76] is hereby **GRANTED IN PART AND DENIED IN PART**.

Plaintiffs' Negligence Per Se (Count VI), Reckless Infliction of Emotional Distress (Count X), and Intentional Infliction of Emotional Distress (Count XI) claims are hereby **DISMISSED WITH PREJUDICE**.

Plaintiffs James Doe and Mary Doe's Negligence (Count V), Gross Negligence (Count VII), Negligent Training (Count VIII), and Negligent Infliction of Emotion Distress (Count IX) claims are **DISMISSED WITH PREJUDICE**.

After the entry of this Memorandum and Order, Plaintiffs James Doe and Mary Doe will no longer have any claims at issue in this case, but Plaintiff John Doe will proceed to trial on Count I (Breach of Contract), Count II (Promissory Estoppel), Count V (Negligence),

Count VII (Gross Negligence), Count VIII (Negligent Training and Supervision of Employees), Count IX (Negligent Infliction of Emotional Distress), and Count XII (Unjust Enrichment).

**SO ORDERED** this 31st day of March, 2011.

_____s/ Harry S. Mattice, Jr._____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE